FILED

00 NOV -1 AM 10: 43

U.S. DIST CT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| ELECTRIC POWER SYSTEMS, INC., <br><br> Plaintiff, <br><br> v. <br><br> SQUARE D. COMPANY; GROUPE SCHNEIDER; SOUTHERN ELECTRIC SUPPLY COMPANY, INC., <br><br> Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| SQUARE D. COMPANY, <br><br> Counter-Claimant, <br><br> v. <br><br> ELECTRIC POWER SYSTEMS, INC. <br><br> Counter-Defendant | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| SOUTHERN ELECTRIC SUPPLY COMPANY, INC., <br><br> Third-Party Plaintiff, <br><br> v. | ) ) ) ) ) ) ) ) |

CV 00-BU-0030-S

**ENTERED**

NOV 0 1 2000

70

| | |
|---|---|
| MASS. ELECTRIC CONSTRUCTION CO., INC., d/b/a/ MASS. ELECTRIC CONSTRUCTION<br><br>Third-Party Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ENTERED
NUV. 0 1 2000

## Memorandum Opinion

Now before the Court in the above-styled action are two motions for summary judgment. The first was filed September 1, 2000 by Square D. Company ("Square D"), which asserts that it is entitled to summary judgment on all claims filed against it by Plaintiff to this action, Electric Power Systems, Inc. ("EPS"). (Doc. No. 47). The second motion was filed on September 7, 2000 by Southern Electric Supply Company, Inc. ("Southern"), which contends that summary judgment is warranted with respect to both the claims asserted against it by EPS and the third-party claim Southern asserts against Third-Party Defendant Mass. Electric Construction Co., d/b/a Mass. Electric Construction Co., Inc. ("Mass. Electric"). (Doc. No. 50). The parties have filed evidence and briefs in support of their respective positions on the motions, which are now ripe for decision. Upon consideration, the Court concludes that Square D's motion for summary judgment is due to be GRANTED and that Southern's motion for summary judgment is due to be GRANTED insofar as the claims EPS asserts against Southern but DENIED to the extent that it seeks summary judgment on the third party claim asserted against Mass. Electric.

### I. SUMMARY JUDGMENT STANDARDS

On a motion for summary judgment, the court assesses all of the proof the parties

can bring to bear in order to ascertain whether a genuine need for trial is present. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. Celotex, at 323. See also Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its to initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." Howard v. BP Oil Company, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. Rooney v. Watson, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing Hale v. Tallapoosa Co., 50 F.3d 1579, 1581 (11th Cir. 1995)).

## II. BACKGROUND[1]

EPS was an electrical testing subcontractor on a project (the "Project") to build a manufacturing plant in Decatur, Alabama, for The Boeing Company ("Boeing"). EPS did

---

[1] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record. These are the 'facts' for summary judgment purposes only. They may not be the actual facts. See Cox v. Administrator U.S. Steel & Carnegie, 17 F.3d 1386, 1400 (11th Cir. 1994)." Underwood v. Life Ins. Co. of Georgia, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

this electrical testing work pursuant to a subcontract with Mass. Electric, which, in turn, performed a portion of the electrical construction on the Project under a subcontract with Austin-Alberici, the general contractor on the Project.

Square D manufactured and supplied a large portion of the electrical distribution and control equipment on the Project through a purchase order agreement ("original purchase order agreement" or "original agreement") with Boeing.[2] The benefit of that original agreement, signed by Square D's representative on June 3, 1998, was also afforded to Austin-Alberici to the extent that it acted as Boeing's representative on the Project. Under the portion of the original agreement governing "Changes and Extra Work," Boeing reserved "the right by written order only to make any change, including additions, reductions or deletions, in the . . . materials to be furnished by [Square D], and [Boeing] shall make an appropriate equitable adjustment therefor in the price and time of performance."[3] Square D also acknowledged in the purchase order that the equipment it was selling to Boeing "shall be installed by an installing Subcontractor" and that "[a]ll warranties and/or guarantees given to [Boeing] shall be transferred to the Subcontractor as if it had purchased the . . . equipment." Original Purchase Order at ¶ 8. And finally, the parties allocated the risk of loss as passing to Boeing only after it made its "final inspection" of the materials, which was to be completed "within a reasonable time after arrival at the ultimate destination," in this case, the Project site.

In a letter dated September 30, 1998, a Square D representative wrote to an Austin-

---

[2]Technically, the original purchase order agreement specifies that Square D was selling these electrical products to McDonnell Douglas Corporation, a wholly owned subsidiary of Boeing. However, the parties do not treat this distinction as being significant, so the Court will treat McDonnell Douglas and Boeing as one in the same for purposes of their dealings in this case, referring to them simply as "Boeing."

[3]Boeing adjustment was subject to a seven-day period whence Square D might present written notice that it objected to the proposed adjustment as inadequate.

Alberici manager on the Project, stating as follows:

> Thank you for using Square D equipment on this very important project. We are dedicated to making this project a success.
>
> It is also important to us to provide 100% of the electrical distribution and control equipment for the building. We understand that the Boeing Company will standardize the selection of electrical distribution and control components where reasonable during facility construction and follow up operation. The decision regarding specific selections will be based on operational and economic factors.
>
> In consideration of this, we will provide the equipment to Boeing and Austin-Alberici at the lowest selling price developed from orders received as a result of the bid process for the largest size projects over the twelve (12) months prior to the order being placed. Furthermore, the unit price will not exceed the price of the same component currently provided to the Boeing Company under any existing service or supply agreement now in effect.
>
> These prices will be in effect for all types of purchases for this project including change orders and purchases by third parties. This will give you the benefit of the bid process without the expense and time normally involved.

EPS and Mass. Electric contend that the pricing terms of this letter (hereinafter referred to as the "pricing letter") formed or became part of a contract between Square D and Austin-Alberici and/or Boeing, whereby Square D would be the exclusive supplier of electrical distribution and control products on the Project. Square D disputes this, claiming that neither Austin-Alberici nor Boeing ever acknowledged the terms of the pricing letter or that an exclusivity contract existed. However, Square D states that it is willing to assume, for purposes of summary judgment, that the terms of the pricing letter became part of a contract between Square D and Austin-Alberici and/or Boeing.[4]

On May 15, 1999, one of the products Square D sold to Boeing, an electrical

---

[4] See Square D's Brief in Support of Motion for Summary Judgment, at 22.

substation transformer, caught fire and exploded while EPS was performing electrical testing on the Project. It is undisputed that this transformer was one of several that Square D had custom-engineered and sold directly to Boeing at a cost of $34,150.67 each, with a 12-week lead time between order and delivery. At first, it was not clear what had caused the transformer to fail, but by about May 17, 1999, it had come to light that an employee of EPS was to blame for the destruction of the transformer and that he had attempted to cover up his involvement by altering the transformer after the accident to make it appear that it was defective. After becoming aware of this, Paul Fabin, Austin-Alberici's electrical supervisor on the Project, spoke with Matt Swanson, Mass. Electric's manager on the Project. Fabin told Swanson that Austin-Alberici was going to hold Mass. Electric, which had brought EPS in on the Project through its subcontract, responsible for securing the purchase of the replacement transformer. Fabin also strongly impressed upon Swanson that the replacement transformer had to be delivered by June 4, 1999, in order to meet Austin-Alberici's schedule on the Project. Fabin likewise directed Bob Doyle, an executive sales engineer for Square D, to get a price quote on a replacement transformer to be delivered in about two weeks and give it to Mass. Electric. Fabin explained to Doyle that Mass. Electric, rather than Austin-Alberici, was going to place the purchase order and pay for the replacement transformer because it was Mass. Electric's subcontractor, EPS, that was at fault for destroying the original.

    Swanson claims that on May 18, 1999, he met with Doyle in Mass. Electric's trailer on the Project site to discuss obtaining a replacement transformer from Square D. Also present for these discussions was Terry Ridgeway, a sales manager for Southern, one of Square D's distributors. Doyle explained to Swanson that Square D could not sell the transformer directly to Mass. Electric, which had no account with Square D, so the transaction would have to go through one of Square D's distributors. Doyle also emphasized that he had to have a purchase order by May 19, 1999, in order to ensure

delivery by June 4th. While Doyle went outside to call Square D personnel on his cell phone to get a price quote, Swanson entered into an agreement with Ridgeway to purchase the replacement transformer from Southern, based on Southern's cost, plus a five percent margin and a freight charge. Doyle came back inside the trailer and communicated to Swanson and Ridgeway that Square D would agree to sell the replacement transformer for a total of $145,044.00, which included a $7,800.00 fee for "field service." Swanson picked up a calculator and determined that the five percent mark-up for Southern implicated a resale price of $152,296.20, after which Swanson stated to Doyle and Ridgeway, "[F]or all practical purposes make it 153." Swanson acknowledges that he did not object to this price as too high at that time, but he disputes that he "agreed" to pay that price. Rather, Swanson alleges that he informed Ridgeway that EPS was ultimately going to be responsible for the cost of the replacement because it had destroyed the original. Thus, according to Swanson, "the way it was left" between Ridgeway and himself was that the final price was "an EPS and Square D issue," which Swanson believed would be decided in subsequent negotiations between those parties.

On May 19, 1999, Swanson faxed a Mass. Electric purchase order for the replacement transformer to Ridgeway at Southern's offices. This purchase order did not list any price, though. Instead, at the bottom of the page was printed, "Final Price to be Negotiated After Receipt of Proposal." Ridgeway acknowledges having seen that language, but he states that he was unsure what it meant and did not think it of any particular significance, believing that Swanson had already agreed to pay the $153,000 price Swanson had stated previously. Upon receiving Mass. Electric's purchase order, Ridgeway handwrote upon it "COST 145,044.00," above the description of the replacement transformer, reflecting the price Square D had quoted to Southern. Ridgeway also filled in "153,000.00." in the space provided for "price," which he indicated was "Including Field Service Work," and he wrote that there would be an additional

charge for "FREIGHT," up to a "Maximum of 1500.00." At about this same time, Ridgeway generated a formal price quotation document, listing these same amounts, $153,000.00 for the replacement transformer and a $1,500.00 maximum for freight. Ridgeway then faxed the Southern price quote and the Mass. Electric purchase order including Ridgeway's handwritten additions, back to Swanson at Mass. Electric. Ridgeway also generated a Southern purchase order for the replacement transformer and sent it to Square D, reflecting that Southern would pay $137,244.00 for it (the price Doyle had quoted minus the $7,800.00 charge for "field services"). After sending the purchase order to Southern, Ridgeway received a telephone call from Swanson, who asked him if he "had a problem with the verbiage" on Mass. Electric's purchase order, "Final Price to be Negotiated After Receipt of Proposal." Ridgeway replied in the negative.

Both Square D and Southern fulfilled their respective obligations to deliver the replacement transformer and ensure that it was operating properly within the time agreed upon. Southern paid Square D pursuant to the terms of their contract to deliver the replacement transformer for resale. Southern then sent an invoice dated June 14, 1999 to Mass. Electric in the amount of $155,087.52. It is undisputed that this invoice is due to be reduced by at least $587.52 as an adjustment to Southern's freight charges. Mass, however, has not paid Southern. Rather, Mass. Electric requested EPS to pay the stated invoice, given that it was EPS's employee that was responsible for destroying the original transformer. EPS, through its insurance carrier, Travelers Indemnity Company, admitted liability to pay some amount, at least $30,000, for the replacement transformer, but a dispute arose over how much EPS owed. Moreover, according to the complaint, Mass. Electric has withheld approximately $170,000 which would have been payable to EPS under the subcontract between them, until the issue of EPS's payment for the cost of the replacement transformer is resolved.

EPS filed this action in Alabama state court on October 21, 1999, naming as

defendants Square D, Groupe Schneider,[5] Southern, and fictitious defendants. In Count I, EPS seeks declaratory relief. Claiming that it and EPS were third-party beneficiaries of the pricing letter sent by Square D to Austin-Alberici on September 30, 1998, EPS requests an order stating that Square D is estopped or barred from claiming any charges "above the original price of the unit to Boeing or Austin-Alberici" and requiring Square D "to compute the lowest price for the subject item with reference to all factors referred to in [Square D]'s letter of September 30, 1998, and supply said data to [EPS] . . . ." Id. at ¶8. In Count II, EPS claims that Defendants are liable for breach of contract. In Count III, EPS claims that Defendants are liable for misrepresentation and/or suppression. And in Count IV, EPS alleges that Defendants tortiously interfered with EPS's contractual relations. EPS acknowledges that this final claim has been "subsumed in" the breach of contract and fraud claims, and that EPS has "surrendered its damages claim of lost business opportunities," which the Court infers to be part of Count IV. The Court considers EPS's statements to mean that it is abandoning its claim in Count IV, insofar as being pursued as an independent cause of action.

Defendants subsequently removed the case to federal court under 28 U.S.C. § 1441. This Court has jurisdiction under 28 U.S.C. § 1331. Square D then filed its answer, in which it also asserted a number of counterclaims against EPS. Square D alleges that EPS participated in abuse of process and civil conspiracy, by filing suit "for the ulterior purpose of wrongfully coercing or extorting price concessions . . . ." Square D's Answer and Counterclaim at 4. Square D also contends that EPS negligently or recklessly caused the transformer to fail and then attempted to escape liability by wrongfully blaming

---

[5]The Court notes that the name "Groupe Schneider" appears on a number of Square D documents in the record. Square D, however, has asserted in its answer that Groupe Schneider is not a legal entity and has been improperly named as a defendant in this suit. In any event, it is clear that to the extent Groupe Schneider might be properly in this suit, it would only be liable to the extent that Square D would be.

Square D for the failure and is liable for spoilation. Id. at 5. In that same vein, Square D claims that EPS's negligence or recklessness caused the transformer accident and proximately caused Square D to incur "accelerated processes and expenses associated with field services, and other damages." Id. at 7. Square D also alleges that EPS "owed Square D a duty not to blame Square D for EPS's own wrongdoing." Id. Southern then answered, and filed original and amended third-party complaints against Mass. Electric. Southern contends that Mass. Electric is liable to pay Southern $154,500 plus finance charges and costs due "by open account for goods sold and delivered . . ." and that Mass. Electric is estopped from denying that it owes the full amount claimed by Southern on the replacement transformer. See Southern's Amended Third-Party Complaint at 7.

Square D and Southern have now each filed motions for summary judgment. Square D and Southern both argue that they are entitled to summary judgment with respect to all claims EPS has asserted against them. Southern additionally contends that it is entitled to summary judgment on its third-party claims against Mass. Electric.

### III. CONTENTIONS & ANALYSIS
#### A. The Contract Claims against Square D and Southern
##### 1. The Original Purchase Order and the "Pricing Letter"

EPS claims in its complaint that Southern and Square D are each liable for breach of contract under Alabama law. EPS first asserts that both it and Mass. Electric were third-party beneficiaries of a contract or contracts between Square D and Boeing and/or Austin-Alberici, based on the original purchase order and the pricing letter sent by Square D to Austin-Alberici on September 30, 1998. EPS suggests that the original purchase order limited the price Square D could charge for materials sold on the Project to the cost of materials, labor, rental equipment, insurance, and some percentage for overhead and profit. EPS also argues that under the terms of the pricing letter, Square D obligated itself to provide "electrical distribution and control components" to be supplied "during facility

construction and follow up operation" "at the lowest selling price developed from orders received as a result of the bid process for the largest size projects over the twelve (12) months prior to the order being placed[, with] the unit price . . . not [to] exceed the price of the same component currently provided to [Boeing] under any existing service or supply agreement now in effect." Emphasizing that the pricing letter expressly includes that such prices will be made available "for all types of purchases for this project including change orders and purchases by third parties," EPS urges that such evidences an intent that third parties purchasing replacement equipment for the Project from Square D would be beneficiaries covered by the pricing terms of the letter. However, Square D did not, EPS urges, extend the benefit of the pricing letter when it sold the replacement transformer, and Square D thus breached the terms thereof.

First, it is evident to the Court that summary judgment is warranted in Southern's favor on EPS's claims against Southern for breaching the terms of the original purchase order agreement and the pricing letter, to the extent the latter constituted part of a contract. The evidence establishes, despite EPS unsupported arguments to the contrary, that Southern, which is but one of many distributors of Square D-manufactured products, was not a party to the pricing letter or any other relevant contract between Square D and Boeing or Austin-Alberici. Under Alabama law,[6] as elsewhere, because Southern was not a party to such a contract, it cannot be liable for breach. See Ex parte Dickinson, 711 So. 2d 984, 989 (Ala. 1998); Kyser-Smith v. Upscale Communications, Inc., 873 F.Supp. 1519, 1524 (M.D. Ala. 1995). The Court now turns to EPS's similar claims against Square D.

"To recover under a third-party beneficiary theory, the complainant must show: 1) that the contracting parties intended, at the time the contract was created, to bestow

---

[6] Erie Railroad v. Tompkins, 304 U.S. 64 (1938), mandates that in diversity actions, federal courts must apply the substantive law of the state in which they sit.

a direct benefit upon a third party; 2) that the complainant was the intended beneficiary of the contract; and 3) that the contract was breached." McGowan v. Chrysler Corp., 631 So. 2d 842, 848 (Ala. 1994) (quoting Sheetz, Aiken & Aiken, Inc. v. Spann, Hall, Ritchie, Inc., 512 So. 2d 99, 101-02 (Ala. 1987)). The plaintiff must establish that the contract was intended for his direct benefit – a mere incidental benefit will not suffice. See Ex parte Dyess, 709 So.2d 447, 450 (Ala. 1997). Thus, interpreting Alabama law, the Fifth Circuit Court of Appeals has explained:

> In a large construction project each of the individual contracts is inevitably intertwined with many others, all devoted to the general goal of finishing all phases of the project according to the plans and specifications drawn up by the architect and within the time period established under the prime contract. But this interrelationship by itself does not justify imposing third-party beneficiary duties, which flow not from the inevitable consequences of a breach but rather from the intent of the contracting parties.

E. C. Ernst, Inc. v. Manhattan Const. Co. of Texas, 551 F.2d 1026, 1030 (5th Cir. 1977). (citation and footnote omitted).

The Court concludes that the evidence conclusively shows that EPS is not a third party beneficiary to the original purchase order agreement, at least insofar as it concerned ordering additional materials or changes in the work. EPS's entire argument on this point hinges on Square D's acknowledgment in the purchase order agreement that the materials Square D sold to Boeing would be assigned to an "installing Subcontractor" and that such would receive "all warranties and/or guarantees given to [Boeing] as if [the Subcontractor] had purchased the material/equipment." EPS takes this sentence as affording such an "installing Subcontractor" substantial rights with respect to ordering and approving additions and changes in the work, apparently under the same terms afforded to Boeing and Austin-Alberici. However, there are two problems with EPS's interpretation. First, EPS is not an "installing Subcontractor," but is, rather a subcontractor of one, i.e., Mass. Electric. And second, EPS interprets this single sentence in isolation and far too broadly.

Even if EPS might be considered an "installing Subcontractor," there is insufficient indication that the "warranties and/or guarantees" afforded to it by Square D would include sharing the very substantial rights Boeing reserves to itself specifically with regard to approving and ordering materials for the job. The sentence simply will not stretch as far as EPS would have it. Summary judgment is due to be granted on this claim.

Whether EPS might be a third-party beneficiary of the pricing letter, however, presents a closer question, assuming, as Square D does for purposes of its motion, that Square D is bound by its terms. There is clearly an indication that, in exchange for the right to be the exclusive supplier of electrical distribution and control products on the Project, Square D was offering to afford the price terms of the letter to any third party purchasing such equipment for the Project. Moreover, there is no limitation that such pricing only applied to the original products or precluded purchases for products negligently destroyed, as the letter specifies that this pricing offer applies to "all types of purchases for this project including . . . purchases by third parties," and the letter also refers to Boeing's standardization of components during the "follow up operation" of the facility. However, even though the record shows that Swanson might have indicated that Mass. Electric intended to pass the cost of the replacement transformer along to EPS, the evidence does not support EPS's contention that it was, in fact, the party that purchased or attempted to purchase the replacement transformer from Square D. Rather, the record shows Mass. Electric did so, at Austin-Alberici's direction.[7] EPS blew up the original transformer, and thus might be exposed to liability to reimburse Mass. Electric for some or all of the costs it incurs in securing the replacement. If EPS is so exposed, it would indeed benefit from Mass. Electric's receiving a lower price on the replacement from

---

[7]The Court here disregards for the moment that there were technically two contracts involved in the purchase of the replacement transformer: one between Square D and its distributor, Southern, and another between Southern and Mass. Electric.

Square D by virtue of the terms of the pricing letter. The same would be true, though, of anyone who might be liable to the purchaser for the cost of replacement, including EPS's individual employee, and the fact that EPS is a subcontractor on the Project does not change the fact that any benefit to EPS would be incidental, rather than direct. Nothing in the pricing letter suggests an intent to benefit anyone who merely might be found liable to a purchaser for his cost. Because the Court concludes EPS is not a third-party beneficiary to the original purchase order agreement or the pricing letter, summary judgment is warranted on EPS's claim that Square D breached their terms.

Further, even assuming that EPS could sue Square D as a third-party beneficiary of the original purchase order agreement or the pricing letter, the Court would still grant summary judgment with respect to EPS's claims against Square D alleging breach thereof. This is because there is no question but that the replacement transformer was purchased pursuant to the terms of the subsequent purchase order agreements between Square D and Southern and between Southern and Mass. Electric, not pursuant to the terms of any contract between Square D and Boeing and/or Austin-Alberici. As Square D concedes, Boeing or Austin-Alberici might have chosen to proceed under the terms of their contracts with Square D in obtaining the replacement transformer, but they expressly chose not to do so, instead ordering Mass. Electric to bear the risks associated with paying for the replacement after it became known that the subcontractor Mass. Electric brought on the job was responsible for destroying the original. Thus, EPS cannot show that the purchase of the replacement transformer implicated a breach of any contract between Square D and Boeing or Austin-Alberici.

EPS argues, however, that the series of contracts between Square D, Southern, and Mass. Electric for the replacement transformer was invalid. More particularly, it is argued that the contracts between Square D, Southern, and Mass. Electric fail for lack of

consideration, in that Square D, EPS alleges, was already obligated under their agreement with Boeing and Austin-Alberici to provide the replacement transformer, and within the two-week deadline.[8] See, e.g., Moore v. Williamson, 213 Ala. 274, 277, 104 So. 645, 648 (1925) ("[I]t is an established principle that the doing or undertaking to do only that which one is already under a legal obligation to do by his contract is no consideration for the secondary, subsequent, or new agreement.") However, even assuming that Square D would have been obligated to Boeing and/or Austin-Alberici if either had chosen to pursue the matter, Square D clearly had no existing obligation to deliver a transformer to either EPS or Mass. Electric. Therefore, the Court concludes, the purchase order contracts for the sale of the replacement transformer, between Square D and Southern and between Southern and Mass. Electric were supported by consideration. Summary judgment shall be ordered on EPS's contract claims against Square D based on the original purchase order agreement and the pricing letter.

### 2. The Contracts for the Replacement Transformer

EPS also claims that it is entitled to recover as third-party beneficiary against Square D and/or Southern based on the agreements to sell the replacement transformer to Mass. Electric. EPS claims that the words "Final Price to be Negotiated After Receipt of Proposal" on the Mass. Electric purchase order received by Southern made the contract to purchase the replacement transformer an "open price term" contract under § 7-2-305, Ala. Code 1975. EPS asserts that Southern and/or Square D breached their contract or contracts by not negotiating the price with either Mass. Electric or EPS, and instead taking the position that the price to be paid is fixed at $153,000. Again, even assuming that EPS is a third-party beneficiary, or even an original party, for that matter, to a

---

[8]EPS says this is so based on the strict terms of the original purchase order agreement between Square D and Boeing regarding delivery of materials within established deadlines and the risk of loss, which, EPS contends, was still on Square D because the original transformer had not yet passed final inspection.

contract to secure the replacement transformer, the Court fails to see how EPS has indicated that Southern or Square D breached any contractual obligation they owed. The record is clear that the promises made on the part of Southern and Square D were to deliver the replacement transformer to the Projects site within a specific period and ensure that it was in working order. There is no question that this occurred. EPS and Mass. Electric also suggest that Terry Ridgeway additionally promised to try to see if Square D would come down on the price for which it would sell the transformer to Mass. Electric. Assuming that such was a contractual obligation, Ridgeway claims that he made a good-faith attempt to do so, but to no avail. There is no evidence to dispute this. Thus, there is no question but that Southern and Square D fulfilled the terms of their promises. The fact that there now may be a disagreement about what exact promise was given in exchange by Mass. Electric (or EPS) with respect to the price to be paid for the replacement simply does not implicate a failure on the part of either Southern or Square D to abide by the terms of their respective promises. Such is unchanged by EPS and Mass. Electric's characterization of Southern's adhering to its position that it is owed a sum certain by Mass. Electric as a contractual "breach." Summary judgment will be granted for Southern and Square D on these claims.

### B. Southern's Claims against Mass. Electric

Southern has also moved for summary judgment on its third-party claims against Mass. Electric to recover the purchase price for the replacement transformer. Southern contends that it is entitled to the $153,000 from Mass. Electric. However, the Court concludes that the conflicting testimony offered by Ridgeway and Swanson as to what exactly was said in the formation of their agreement creates a genuine issue of fact as to the amount owed and precludes an entry of judgment as a matter of law. Accordingly, Southern's motion for summary judgment on its third-party claim against Mass. Electric is due to be denied.

### C. The Fraud Claims

#### 1. Misrepresentation

EPS argues that it is entitled to recover against Square D and Southern under Alabama law for misrepresentation. More specifically, EPS argues in its brief that Square D and Southern misrepresented "that the cost of [the replacement transformer] would be $145,044 or $153,000 with additional charges, [while] the actual cost . . . was much less." In order to recover on this claim, EPS would have to prove, at a minimum, that there was a false representation concerning a material fact, upon which EPS relied to its detriment. See, e.g., Smith v. Reynolds Metals Co., 497 So. 2d 93, 95 (Ala. 1986). However, the evidence undisputedly shows that Square D merely stated that it would sell the replacement transformer for a price of $145,044, which included a $7,800.00 fee for "field services." Southern similarly stated that it would resell the transformer at the price of $153,000, based on the cost Square D charged it and Matt Swanson's calculation of Southern's agreed-upon five percent margin. Neither Square D nor Southern ever represented that these amounts were the "cost" to produce the transformer, as EPS would seem to suggest. Moreover, EPS has entirely failed to indicate how it allegedly relied to its detriment upon either supposed misrepresentation.[9] These claims against Southern and Square D are baseless and will be dismissed by summary judgment.

#### 2. Fraudulent Suppression

EPS also contends that Square D and Southern are liable under Alabama law for fraudulent suppression. The elements of a claim of fraudulent suppression are: (1) the suppression of a material fact (2) that the defendant has a duty to communicate (3) because

---

[9]EPS alleges that it has been damaged by the fact that Mass. Electric has withheld payment amounts that are ostensibly owed to EPS under their subcontract, presumably as some sort of set off against the cost of the replacement transformer. However, it would not seem that such harm to EPS is proximately caused by Mass. Electric's decision to withhold the money, whether rightful or wrongful, rather than by any actions taken by Southern or Square D.

of a confidential relationship between the parties or because of the circumstances of the case and (4) injury resulting as a proximate consequence of the suppression. Applin v. Consumers Life Ins., Co., 623 So. 2d 1094, 1098 (Ala. 1993), overruled on other grounds, Boswell v. Liberty Nat'l Life Ins. Co., 643 So.2d 580 (Ala.1994). EPS first argues that Square D and/or Southern were required to disclose the existence of the pricing letter of September 30, 1998, so that EPS and/or Mass. Electric might have asserted rights thereunder as third-party beneficiaries. However, "contracting parties do not have a duty to disclose the terms of that contract to a third-party beneficiary even if the existence of such a beneficiary is intended by the contracting parties." Deerman v. Federal Home Loan Mortg. Corp., 955 F.Supp. 1393, 1405 (N.D. Ala. 1997) (citing Total Containment, Inc. v. Environ Products, Inc., 1996 WL 239877 at * 2 (E.D. Pa. May 6, 1996); Restatement (Second) Contracts § 311 (1981)), aff'd, 140 F.3d 1043 (11th Cir. 1998) (table). Thus, even assuming that the pricing letter constituted part of an enforceable contract and that EPS and/or Mass. Electric were third-party beneficiaries, summary judgment for Square D and Southern is still warranted. EPS also seems to suggest that Southern and Square D had an affirmative duty to disclose the price of the original transformer sold to Boeing and the "cost" of actually manufacturing the replacement transformer. The Court finds that there is no legal basis for EPS's assertion, however. Accordingly, summary judgment is due to be granted on EPS's fraudulent suppression claims.

### D. Declaratory Relief

Having disposed of each of EPS's substantive claims for breach of contract and fraud, the Court also concludes that summary judgment is also warranted in favor of Southern and Square D on EPS's claim in Count I of its complaint seeking declaratory relief.

### IV. CONCLUSION

Based on the foregoing, the Court concludes that the record shows that there is no

genuine issue of material fact and judgment is proper as a matter of law with respect to any claim asserted by EPS in its complaint against Square D and Southern. Accordingly, the motion for summary judgment filed by Square D (Doc. No. 47) is due to be GRANTED in its entirety. The motion for summary judgment filed by Southern (Doc. No. 50) is likewise due to be GRANTED insofar as it pertains to the claims EPS asserts against Southern, but the motion is also due to be DENIED to the extent that it sought a judgment on the third-party claim asserted against Mass. Electric. Thus, the only claims remaining in this action are Square D's counterclaims against EPS, which the Court notes appear to be of dubious viability themselves, and Southern's claim against Mass. Electric to recover the purchase price of the replacement transformer. A separate order will be entered.

**DONE and ORDERED** this 31st day of October, 2000.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE